## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TERESA BRAUER, | : | |
| Plaintiff, | : | |
| | : | No. 3:17-CV-2131 (VLB) |
| v. | : | |
| | : | |
| MXD GROUP, INC., | : | September 4, 2019 |
| Defendant. | : | |

### MEMORANDUM OF DECISION GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [Dkt. 23]

Plaintiff Teresa Brauer ("Plaintiff" or "Ms. Brauer") brought this action against Defendant MXD Group, Inc. ("Defendant" or "MXD") in Connecticut Superior Court on November 28, 2017, alleging retaliation, gender discrimination, *quid pro quo* sexual harassment, and aiding and abetting discriminatory employment practices in violation of the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. §§ 46a-60(b)(1), (b)(4), (b)(5), (b)(8). *See generally* [Dkt. 1-1 (Compl.)]. Plaintiff's claims arise out of her temporary employment with MXD, interactions during her employment with a supervisory employee, Allen Martin, and termination of her temporary employment on March 12, 2018. *Id.* MXD removed the case to federal court on December 20, 2017. [Dkt. 1 (Notice of Removal)]. Before the Court now is Defendant's Motion for Summary Judgement on all four counts of the Complaint. *See* [Dkt. 23 (Mot. Summ. J.)]. For the reasons set forth below, Defendant's Motion for Summary Judgment is GRANTED in full.

## I. Factual Background

MXD is a corporation that provides logistics services. [Dkt. 23-3 (Def.'s R. 56(a) Statement) at ¶ 1]. MXD was a client of Randstad US, LP ("Randstad"), a temporary staffing agency that finds candidates for clients in various types of placements, including permanent hires, temporary placements, and "temp-to-hire" placements. *Id.* at ¶¶ 3-5. A "temp-to-hire" placement is a temporary placement wherein the client has the option of hiring the temporary worker as a regular employee. *Id.* at ¶ 4.

Through Randstad, MXD interviewed and hired Plaintiff as a temporary worker for a dispatch position. *Id.* at ¶ 6. Plaintiff's "temp-to-hire" placement with MXD began on October 27, 2015. *Id.* at ¶¶ 7-8. MXD contends that Plaintiff was at all times relevant an employee of the temporary staffing agency Randstad US, LP, and was never an employee of MXD as defined by the CFEPA, Conn. Gen. Stat. § 46a-51(9). *Id.* at ¶ 9; [Dkt. 23-2 at 2 n.2]. Plaintiff contends that MXD employed her. [Dkt. 26-2 (Plf.'s R. 56(a) Statement) at ¶ 9]. Exclusively for purposes of its motion for summary judgment, MXD presented the facts in the light most favorable to Plaintiff and assumed that she was an employee of MXD. *Id.* The Court does the same in this decision.

When Plaintiff began her placement in October 2015, Tom Hunt supervised the MXD Newington, Connecticut facility where she worked. [Dkt. 23-3 at ¶ 10]. Allen Martin took over as supervisor during Plaintiff's placement. *Id.* at ¶ 11. During Plaintiff's placement, Martin and Hunt both expressed general satisfaction with her job performance. *Id.* at ¶ 13. Plaintiff was informed at some point that MXD was

considering hiring her as a regular employee. *Id.* at ¶ 16. While Plaintiff did not receive a formal sit-down performance review while at MXD, her personnel file includes records of her performance. *Id.* at 17; [Dkt. 26-2 at ¶ 17].

At some point, Martin became unsatisfied with Plaintiff's job performance. *Id.* at ¶ 18; [Dkt. 26-2 at ¶ 18]. Plaintiff contends that Martin only became dissatisfied with Plaintiff after she rebuffed his advances. *Id.* On February 19, 2016, Martin requested that Randstad find a temporary worker to replace Plaintiff. [Dkt. 23-3 at ¶ 19]. Martin reported to Randstad employee Roxanne Jackson that MXD sought to terminate Plaintiff's placement because she had made mistakes, was unable to master her job responsibilities, and developed a poor attitude. *Id.* at ¶ 20; [Dkt. 26-2 at ¶ 20]. Hunt contacted Randstad on February 23, 2016 to reiterate MXD's desire to replace Plaintiff as soon as possible, explaining that Plaintiff had "completely changed" since MXD expressed interest in "taking her on." *Id.* at ¶¶ 22, 23. Details of these communications were recorded in the Randstad Client Portal. *Id.* at ¶¶ 21, 24. Plaintiff contends that these representations were false. [Dkt. 26-2 at ¶¶ 22, 23]. MXD requested that Plaintiff not be informed of her replacement until one was found. [Dkt. 23-3 at ¶ 25].

During her placement with MXD, Martin regularly referred to Plaintiff as "sunshine" or "ray of sunshine." [Dkt. 23-3 at ¶ 14]. Eight days after Martin asked that Plaintiff be replaced, Martin and Plaintiff had a discussion about work matters, during which Plaintiff sensed that Martin was depressed and flustered. *Id.* at ¶¶ 26-27. Plaintiff asked Martin if he was alright, and Martin stated that he and his wife were having issues and he did not think the marriage would survive. *Id.* at ¶ 28.

Plaintiff, who had previously been married and divorced, told Martin that if he needed to talk, she was there. *Id.* at ¶¶ 29-30. Martin indicated that he knew Plaintiff was single and that he thought she was attractive. *Id.* at ¶ 31. He asked whether she might want to go to dinner with him sometime. *Id.* at ¶ 32. Plaintiff interpreted these comments, as well as Martin's use of pet names for her, as an expression of his romantic and sexual interest in her. *Id.* at ¶ 33; [Dkt. 26-2 at ¶ 33]. Plaintiff declined the invitation, stating that she does not mix business with pleasure. [Dkt. 23-3 at ¶ 34]. Martin apologized and did not make further comments of a personal or romantic nature. *Id.* at ¶ 35. Martin and Plaintiff were alone during the conversation. *Id.*

Martin did not offer or state, either explicitly or implicitly, that Plaintiff would receive any employment benefit or preferential treatment if she engaged in any romantic or sexual conduct with him. *Id.* at ¶¶ 41-43. Nor did Martin ever state or threaten, either explicitly or implicitly, that Plaintiff would be penalized or subject to adverse action if Plaintiff declined to engage in romantic or sexual conduct with him. *Id.* at ¶¶ 44-46. However, Plaintiff claims that, after she rejected Martin's advances, the workplace atmosphere was "horrible," and Martin grew dissatisfied with Plaintiff's performance. [Dkt. 26-2 at ¶¶ 41-46].

Plaintiff's Complaint and interrogatory response indicate, and Defendant agrees, that this encounter took place on February 27, 2016, more than a week after Martin sought to replace Plaintiff. [Dkt. 1-1 at ¶ 14; Dkt. 23-10 (Def.'s Mot. Summ. J., Ex. G Discovery Requests) at p. 5; Dkt. 26-2 at ¶¶ 27, 41-46]. At her deposition, Plaintiff said it happened on a Saturday but could not recall the exact date. *See*

[Dkt. 26-2 at ¶ 47]. Plaintiff contends that Martin grew dissatisfied with Plaintiff only after she declined his advances. Shortly before the end of Plaintiff's placement, Randstad placed another temporary worker, a female, at MXD to replace Plaintiff. [Dkt. 23-3 at ¶ 51].

After Plaintiff was notified that her placement at MXD was ending on March 12, 2016, Plaintiff reported allegations of sexual harassment and discrimination to MXD and Randstad representatives. [Dkt. 23-3 at ¶¶ 48-49, 53]. Plaintiff did not report the allegation sooner because she was afraid any complaints would decrease her likelihood of becoming a permanent MXD employee. [Dkt. 26-2 at ¶¶ 48-50]. Martin denied the allegations when Randstad employee Crystal Petroski reported them to him. [Dkt. 23-3 at ¶¶ 54-55].

## II. <u>Standard of Review</u>

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that no factual issues exist. *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought. *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Property Assurance*

*Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315-16 (2d Cir. 2006) (quotation omitted). In addition, the court should not weigh evidence or assess the credibility of witnesses" on a motion for summary judgment, as "these determinations are within the sole province of the jury." *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996).

"A party opposing summary judgment 'cannot defeat the motion by relying on the allegations in [her] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.' At the summary judgment stage of the proceeding, [p]laintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient." *Welch-Rubin v. Sandals Corp.*, No. 3:03-cv-481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (quoting *Gottlieb v. County of Orange,* 84 F.3d 511, 518 (2d Cir.1996). "Summary judgment cannot be defeated by the presentation . . . of but a 'scintilla of evidence' supporting [a] claim." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)).

## III.  Discussion

Plaintiff asserts her claims for retaliation, gender discrimination, *quid pro quo* sexual harassment, and aiding and abetting a discriminatory employment practice under the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60 *et seq.* ("CFEPA"). CFEPA prohibits employers from, *inter alia*, discriminating against an employee "because of the individual's . . . sex" or "because such person has opposed any discriminatory employment practice," and

prohibits aiding and abetting "the doing of any act declared to be a discriminatory employment practice," or "harass[ing] any employee, person seeking employment or member on the basis of sex."  Conn. Gen. Stat. § 46a-60(b)(1), (b)(4), (b)(5), (b)(8). The analysis of these claims under CFEPA is the same as under the federal statute, Title VII, and the Court accordingly relies on the case law analyzing and interpreting both statutes. *See Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 556 (2d Cir. 2010) (citing *Craine v. Trinity College*, 791 A.2d 518, 531 n.6 (Conn. 2002)); *Williams v. Quebecor World Infiniti Graphics*, 456 F. Supp. 2d 372, 383 (D. Conn. 2006) ("The Connecticut Supreme Court looks to federal precedent when interpreting and enforcing the CFEPA.") (citing *Levy v. Comm'n of Human Rights and Opportunities*, 236 Conn. 96, 103 (1996)).

### A. <u>Count One – Retaliation</u>

The CFEPA forbids an employer from retaliating against an employee who opposes any discriminatory employment practice. Conn. Gen. Stat. § 46a-60(b)(4). In Count One of her Complaint, Plaintiff alleges that MXD retaliated against her for rejecting Martin's sexual advances by terminating her temporary placement with MXD in violation of the CFEPA, Conn. Gen. Stat. § 46a-60(b)(4). [Dkt. 1-1 at ¶¶ 28-31]. Defendant argues that this count fails on summary judgment because Plaintiff cannot present any evidence suggesting that she engaged in protected conduct under Connecticut law or that she was subject to adverse action for doing so. [Dkt. 23-2 (Def.'s Mem. of Law) at 7]. Defendant contends that the evidence shows that the decision to take the alleged adverse action was made, and documented, more

than a week prior to any purported protected conduct such that no reasonable jury could find the necessary causal connection. *Id.* at 7-8.

Retaliation claims are evaluated under a three-step burden shifting analysis. *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005). First, in order to establish a prima facie case of retaliation, a plaintiff must show that: (1) she is engaged in protected participation or opposition under the CFEPA; (2) that the employer was aware of this activity; (3) that the employer took adverse action against the plaintiff; and (4) that a causal connection exists between the protected activity and the adverse action, "i.e., that a retaliatory motive played a part in the adverse employment action." *Byra-Grzegorczyk v. Bristol-Myers Squibb Co.*, 572 F. Supp. 2d 233, 24 (D. Conn. 2008) (quoting *Kessler v. Westchester Cty. Dep't of Soc. Servs.*, 461 F.3d 199, 205-06 (2d Cir. 2006)). The burden of proof a plaintiff must meet to survive a summary judgment motion at the prima facie stage "has been characterized as 'minimal and *de minimis.*'" *Jute*, 420 F.3d at 173 (quoting *Woodman v. WWOR-TV*, 411 F.3d 69, 76 (2d Cir. 2005)). "In determining whether this initial burden is satisfied in a [CFEPA] retaliation claim, the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Id.* (citing *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir. 1987)).

If the plaintiff sustains its initial burden, a presumption of retaliation arises. *Id.* The burden then shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action. *Id.* Finally, if the employer offers such

proof, "the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action." *Id.*

### 1. Prima Facie Case

Defendant argues that Plaintiff's retaliation claim fails at the first step of the analysis because Plaintiff's rejection of Martin's invitation does not constitute protected conduct, and because there is no causal connection between Plaintiff's rejection of Martin's invitation and her termination.[1] [Dkt. 23-2 at 8-9]. For the reasons set forth below, the Court holds that Plaintiff has not established those two essential elements, and her retaliation claim therefore fails.

### a. Protected Activity

"The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000). "An employee is privileged to report and protest workplace discrimination, whether that discrimination be actual or reasonably perceived." *Matima v. Celli*, 228 F.3d 68, 78 (2d Cir. 2000). Indeed, a plaintiff making a retaliation claim need not successfully prove the merits of the underlying discrimination claim, in this case sexual harassment. *Sumner v. United States Postal Serv.*, 899 F.2d 203, 208-09 (2d Cir. 1990); *see also Harper v. Metro. Dist. Com'n*, 134 F. Supp. 2d 470, 487 (D. Conn. Mar. 16, 2001). Rather, she need only demonstrate that she had a "good faith, reasonable belief that the underlying challenged actions of the

---

[1] Defendant also notes that, because Plaintiff cannot establish that she engaged in protected activity, she cannot show that Defendant had knowledge of the protected conduct. [Dkt. 23-2 at 8].

employer violated the law." *Manoharan v. Columbia Univ. Coll. Of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988).

Defendant asserts that Martin's conduct does not rise to the level of sexual harassment, but does not make any arguments concerning the presence or absence of Plaintiff's good faith belief. *See* [Dkt. 23-2 at 9]. Instead, Defendant proceeds to argue a lack of protected activity, assuming *arguendo* that a jury could find that Martin's conduct led to a good faith belief of illegal conduct by Plaintiff. *Id.* As Defendant did, the Court assumes *arguendo* that a jury could find that Plaintiff had a good faith, reasonable belief that Martin's conduct violated the law.[2]

If a jury were to decide that Plaintiff has satisfied the good faith belief requirement, the Court would need to decide the legal question of whether Plaintiff's declination of Martin's alleged sexual advances constitutes protected activity in order for Plaintiff's claim to survive.[3]

"The law protects employees in the filing of formal charges of discrimination as well as in the making of informal protests of discrimination, 'including making

---

[2] The Court notes that it is highly unlikely that a jury could conclude that Plaintiff had a good faith, reasonable belief that Martin's conduct constituted illegal gender discrimination principally because Plaintiff testified at her deposition that she did not believe any of the treatment she received was on account of her gender. *See* [Dkt. 26-4 (Brauer Dep. Tr.) at 81:6-82:9].

[3] It is undisputed that Plaintiff did not make complaints to MXD or Randstad about Martin's behavior until after she was terminated. *See* [Dkt. 23-3 at ¶¶ 48-49; Dkt. 26-2 at ¶¶ 48-49]. Because the adverse action—the termination—occurred before the complaints, Plaintiff cannot, and does not, argue that her termination was retaliation for having made the complaints. *See Gregory v. Daly*, 243 F.3d 687, 701 (2d Cir. 2001) ("Of course, in examining the sufficiency of Gregory's pleadings of retaliation, we must omit from consideration those episodes of harassment that preceded her protected activity (*i.e.*, her workplace complaints and state court lawsuit), since prior harassment could not have been in retaliation for acts not yet taken.").

complaints to management, writing critical letters to customers, protesting against discrimination by industry or society in general, and expressing support of co-workers who have filed formal charges.'" *Matima*, 228 F.3d at 78-79 (quoting *Sumner*, 899 F.2d at 209). Thus, the law protects a wide range of activity in opposition to illegal discrimination. For instance, "[w]hen an employee communicates to her employer a belief that the employer has engaged in a form of employment discrimination, that communication virtually always constitutes the employee's opposition to the activity." *Crawford v. Metro Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 277 (2009). There is not clear consensus, however, about whether rejecting unwanted sexual advances rises to the level of protected activity for purposes of establishing retaliation. *See Little v. Nat'l Broadcasting Co., Inc.*, 210 F. Supp. 2d 330, 386 (S.D.N.Y. 2002) (collecting cases and reflecting a split between courts that have concluded it is protected activity and courts that have concluded the opposite); *see also Percy v. New York (Hudson Valley DDSO)*, 264 F. Supp. 3d 574, 585 (S.D.N.Y. 2017).

Courts that have held that it does constitute protected conduct have reasoned that "[t]he prohibition against retaliation is intended to protect employees who resist unlawful workplace discrimination[;]" "[s]exual harassment by an employer or supervisor is an unlawful practice, and an employee's refusal is a means of opposing such unlawful conduct." *Little*, 210 F. Supp. 2d at 386; *see also Johnson v. Medisys Health Newtork*, No. 10 Civ. 1596 (ERK) (VP), 2011 WL 5222917, at *15 (E.D.N.Y. Jun. 1, 2011) (noting split and following *Little*); *Laurin v. Pokoik*, No. 02 Civ. 1938, 2005 WL 911429, at *4 (S.D.N.Y. 2005) (holding rejection

of sexual advances is protected activity where plaintiff had few other avenues of complaining).

Courts holding the opposite have explained that allowing declination of a sexual advance to constitute protected activity would merge every harassment claim with a retaliation claim. *Del Castillo v. Pathmark Stores, Inc.*, 941 F. Supp. 437, 438-39 (S.D.N.Y. 1991) ("But even the broadest interpretation of a retaliation claim cannot encompass instances where the alleged 'protected activity' consists simply of declining a harasser's sexual advances, which is all that is alleged here by way of 'protected activity.' If it were otherwise, every harassment claim would automatically state a retaliation claim as well."); *Reid v. Ingerman Smith LLP*, 876 F. Supp. 2d 176, 189 (E.D.N.Y. 2012) (holding that rejection of sexual advances does not constitute protected activity); *Doe v. Univ. of Conn.*, No. 3:09-cv-01071, 2012 WL 5305354, at *4 (D. Conn. Oct. 25, 2012) (same). Moreover, one of the key purposes of the anti-retaliation provisions is to prevent an employer from interfering, through retaliation, with an employee's efforts to advance enforcement of the statute's other guarantees, and without any effort by the employee to advance those guarantees by acting in response to discriminatory conduct, there is nothing for an employer to interfere with. *Reid*, 876 F. Supp. 2d at 189; *see also Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010). In addition, in many cases, a harasser will not inform his employer of the harassing behavior, such that there will not be a basis to impute knowledge of the discrimination to the employer. *See Del Castillo*, 941 F. Supp. at 439. Requiring an employee to do more than simply reject a sexual advance will "serve the salutary purpose of informing the employer

of alleged discriminatory conduct in the workplace thus enabling the employer to take such corrective measures as may be necessary." *Reid*, 876 F. Supp. 2d at 189.

Here, Plaintiff claims that her declination of Martin's invitation to dinner constitutes protected conduct. [Dkt. 26-1 at 6-7]. Plaintiff does not claim to have asked him not to make comments about her appearance or call her "sunshine." *See* [Dkt. 23-6 at 91:7-98:23]. She only claims to have told Martin she would not mix business with pleasure by having dinner with him. *Id.* at 98:12-20. Plaintiff does not suggest that she indicated that she was uncomfortable with the invitation, that it was unwelcome, or that she took offense to it. Plaintiff's account of the interaction does not indicate that her declination of his invitation was, or could have been interpreted as, a complaint against him having shown interest in her because of her gender.

The Court holds that Plaintiff's rejection of Martin's invitation does not constitute protected activity. The rejection here does not come close to resembling a complaint, formal or informal, against sexual harassment. Plaintiff's declination simply clarified what she intended to convey when she offered Martin emotional support. It is not akin to an opposition of unlawful workplace discrimination and does not put the employer on notice of the improper conduct. *See Lincoln v. St. Francis Hosp. & Med. Ctr.*, Civ. No. 3:03CV01418 (AWT), 2006 WL 2475029, at * (D. Conn. Aug. 24, 2006) ("While there are no magic words that must be used when complaining about a supervisor, in order to be protected activity the complaint must put the employer on notice that the complainant believes that discrimination is occurring."). Additionally, as in other cases, allowing such conduct to constitute

protected activity would render Plaintiff's retaliation claim and *quid pro quo* sexual harassment claim indistinguishable. Also, given the facts in this case, finding Plaintiff's declination was a complaint could sanction a retaliation trap because Plaintiff offered to have a personal relationship with Martin when she suggested he speak to her about his marital problems. Accordingly, Plaintiff cannot establish that she engaged in protected conduct and her retaliation claim cannot survive.

### b. Causal Connection

Even if Plaintiff had established that she engaged in protected activity of which Defendant had knowledge, her retaliation claim would still fail because she cannot establish a causal connection between that conduct and her termination.

The requisite causal connection "can be established indirectly with circumstantial evidence, for example, by showing that the protected activity was followed by discriminatory treatment or through evidence of disparate treatment of employees who engaged in similar conduct or directly through evidence of retaliatory animus." *Sumner*, 899 F.2d at 209; *see also Cifra v. G.E. Co.*, 252 F.3d 205, 217 (2d Cir. 2001); *Kaytor*, 609 F.3d at 552 (collecting cases).

Plaintiff does not argue or present evidence that Martin expressed retaliatory animus. Nor does she show that similarly situated employees were treated differently. Rather, Plaintiff contends that the temporal proximity between the invitation by Martin and rejection by Plaintiff and her termination from MXD on March 12, 2016 constitute facts from which a jury could infer that Plaintiff's protected activity—the rejection—caused her termination. [Dkt. 26-1 at 10]. The evidence, however, does not support Plaintiff's timeline.

Plaintiff began working at MXD on October 27, 2015. *See* [Dkt. 23-8 at 8]. For several months, MXD was satisfied with Plaintiff's performance. However, on February 19, 2015, Martin communicated to Randstad that Plaintiff's performance and attitude were unsatisfactory and MXD wanted to replace her. *Id.* at 18. Hunt communicated the same notions to Randstad again on February 23, 2019. *Id.* at 19. Both events occurred before Plaintiff rejected Martin's dinner invitation.

Plaintiff's Complaint alleges that she rejected Martin's advances on or about February 27, 2016. *See* [Dkt. 1-1 at ¶ 14]. Additionally, in her response to Defendant's interrogatories, Plaintiff states that the interaction took place on or about February 27, 2016. [Dkt. 23-10 (Def.'s Ex. G, Interrog. Resps.) at 11]. Plaintiff signed a verification form dated September 15, 2018, certifying that she reviewed her interrogatory responses and that they were true to the best of her knowledge and belief. *Id.* at 13. Approximately one month later, at her deposition on October 26, 2018, Plaintiff testified that the interaction took place on a Saturday but could not remember the exact date. [Dkt. 23-6 at 82]. Plaintiff's Opposition Memorandum and Rule 56(A) Statement represent that Plaintiff cannot remember the exact date of the interaction, but that Martin only became unhappy with her performance after she had rejected him. [Dkt. 26-1 at 3, 10; Dkt. 26-2 at ¶¶ 18, 23, 41-46].

Plaintiff presents no evidence to contradict her own representations in her complaint and sworn interrogatory response that the interaction between she and Martin occurred on February 27, 2016. Though Randstad and MXD did not inform Plaintiff of her termination until March 12, 2016, the evidence shows that MXD made the decision to end her placement on or before February 19, 2016. The evidence

also shows that the Defendant intentionally withheld its dissatisfaction with Plaintiff's work until a replacement was found. Consequently, on the date Plaintiff rejected Martin's dinner invitation, she would not have known he had already decided to terminate her. Because the decision to terminate Plaintiff was made before Plaintiff rejected Martin, the rejection could not have caused her termination. *See Gregory v. Daly*, 243 F.3d 687, 701 (2d Cir. 2001).

Plaintiff cannot establish that she engaged in protected activity or that there is causal connection between the alleged protected activity and the adverse employment action.[4] As a result, Plaintiff's retaliation claim fails and the Court grants summary judgment for Defendant on Count One.

### B. Count Two – Gender Discrimination

In Count Two of her Complaint, Plaintiff alleges that Defendant discriminated against her on the basis of her sex in violation of the CFEPA, Conn. Gen. Stat. § 46a-600(a)(1), by interfering with her privilege of employment, limiting and

---

[4] The Court notes that, even if Plaintiff's retaliation claim did not fail at the prima facie case stage, Plaintiff would still fall short of showing that MXD would not have taken the adverse employment action but for a design to retaliate against her for her protected activity. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013). Defendant is easily able to articulate, and support with evidence, a legitimate, non-retaliatory motivation for deciding to termination Plaintiff. As the Randstad communication records show, while initially communicating satisfaction with Plaintiff's performance, MXD employees Hunt and Martin reported a deterioration in her performance and attitude starting in mid-February 2016. [Dkt. 23-8 at 18-21]. MXD represented to Randstad that it sought to replace Plaintiff because she was not filling out her time cards correctly or adequately performing her responsibilities, and because she had a bad attitude and was talking too much with others in the office about both business and personal issues. *Id.* As the discussion regarding the lack of a causal connection illustrates, Plaintiff has not presented evidence tending to show that MXD's proffered reasons for her termination were a pretext and that MXD intentionally retaliated against her for engaging in protected activity. Thus, Plaintiff would fail to satisfy her ultimate burden of proof as well.

classifying her by her gender in such a way that deprived her of her employment and/or employment opportunities, treating her differently from similarly situated employees, terminating her employment on account of her gender, and imposing discriminatory terms and conditions of employment based on her gender. [Dkt. 1-1 at ¶¶ 32-36].

As with retaliation claims under the CFEPA, gender discrimination claims are governed by the *McDonnell Douglas* burden-shifting framework. Thus, first, the plaintiff must establish a prima facie case of discrimination by showing that: "(1) she is a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination." *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999). If the plaintiff makes out a prima facie case, the burden shifts to the defendant to demonstrate a legitimate, non-discriminatory rationale for the adverse action. *Id.*; *see also Byra-Grzegorczyki*, 572 F. Supp. 2d at 242. If the defendant does so, the ultimate burden of proof shifts back to the plaintiff to demonstrate that the defendant's articulated justification is merely a pretext for intentional discrimination. *Norville*, 196 F. 3d at 95.

"Findings of discrimination, discriminatory intent, and causation are findings of fact." *Cornwell v. Robinson*, 23 F.3d 694, 706 (2d Cir. 1994). To survive summary judgment, Plaintiff must show that there is an issue of material fact about whether MXD discriminated against her on the basis of her sex.

## 1. Prima Facie Case

"The burden of establishing a prima facie case of disparate treatment is not onerous." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Defendant does not take issue with the first three elements of Plaintiff's prima facie case of gender discrimination. Plaintiff is a woman and is therefore a member of a protected class. She was qualified for her the position she held at MXD—MXD hired Plaintiff for the job and provided positive feedback regarding her performance for more than three months. *See* [Dkt. 23-8 at 9-17]. During that period of time, MXD indicated that it wanted to hire Plaintiff permanently once her temporary placement was completed. *Id.* However, her attitude and performance deteriorated after she learned that she would be hired permanently and MXD initiated her termination and replacement. *Id.* at 18-21. As for the third element, Plaintiff suffered an adverse employment action when MXD terminated her placement and decided not to hire her on a permanent basis. *See Fahrenkrug v. Verizon Servs. Corp.*, 652 F. App'x 54, 56 (2d Cir. 2016) (a termination of employment is "sufficiently disadvantageous to constitute an adverse employment action").

Defendant argues that Plaintiff cannot make a prima facie showing of the fourth element—circumstances giving rise to an inference of discrimination. [Dkt. 23-2 at 17-20]. Defendant argues that Plaintiff's claim is defeated by her own statements during her deposition that she did not believe she was deprived of employment opportunities on the basis of her gender. *Id.* at 17. Defendant further argues that Plaintiff failed to plead a prima facie case of disparate treatment because she did not allege or identify any similarly situated male employees who

18

were treated differently than her or show that MXD hired someone outside of her protected group to replace her, and the circumstances leading to her termination suggest that gender was not a factor. *Id.* at 18-19.

The fourth element may be proven by showing that a man similarly situated to Plaintiff in all material respects was treated differently than Plaintiff. *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 63 (2d Cir. 1997). Plaintiff does not provide any similarly situated comparators. An inference of discrimination will also arise "when an employer replaces a terminated . . . employee with an individual outside the employee's protected class." *Littlejohn v. City of New York*, 795 F.3d 297, 312-13 (2d Cir. 2015). That is not the case here either. MXD replaced Plaintiff with another female. *See* [Dkt. 23-8 at 20]. However, these are not the only ways in which an inference of discrimination may arise. In *Littlejohn*, the Second Circuit explained that such an inference "can arise from circumstances *including, but not limited to*, 'the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protect group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.'" 795 F.3d at 312 (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009)).

Plaintiff contends that the facts here—that Martin noted that she was single, referred to her as attractive, and asked her on a date, and that she declined the invitation and was shortly thereafter terminated—evince a "discriminatory atmosphere" sufficient to support an inference of gender discrimination. [Dkt. 26-1 at 16-17]. Taking into account the "minimal" evidence necessary to give rise to

the inference, *Littlejohn*, 795 F.3d at 313, the Court agrees that the facts leading up to Plaintiff's March 12, 2015 termination would be sufficient had they taken place *before* MXD had decided to end Plaintiff's placement.

From Plaintiff's placement at MXD on October 27, 2015, through February 16, 2016, Randstad recorded nine communications with MXD, all with Hunt. *See* [Dkt. 23-8 at 9-17]. During each of these nine communications, Hunt reported that Plaintiff was doing well. *Id.* He also consistently indicated MXD's intention to hire Plaintiff permanently once her temporary placement was completed. *Id.* The first record of Martin reaching out to Randstad is a February 19, 2016 communication in which MXD, for the first time, expresses dissatisfaction with Plaintiff's performance and attitude. *Id.* at 18. In that same communication, Martin indicates that MXD would like to replace Plaintiff. *Id.* On February 23, 2016, Hunt reiterated MXD's dissatisfaction with Plaintiff and the need to replace her. *Id.* at 19. If Plaintiff had rejected Martin's advances *prior* to February 19, 2016, one could infer that the rejection motivated Martin to replace Plaintiff. However, Plaintiff's complaint and sworn interrogatory responses indicate that the rejection occurred on February 27, 2016, after both Martin and Hunt had reported MXD's desire to replace Plaintiff to Randstad.

Plaintiff attempts to walk back her certainty as to that date by representing that she now doesn't remember when the interaction took place. But she provides no evidence tending to support a conclusion that it occurred before February 19, 2016. Plaintiff's surmise that the conversation could have occurred on another day, without evidentiary support showing when the incident occurred, is not sufficient

to create a dispute of material fact as to the date of the interaction, especially in the face of her prior sworn statement that it occurred after the adverse employment action. *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806-07 (1999) (recognizing that lower courts "have held with virtual unanimity that a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction" and holding that the same applies to legal contradictions); *Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 572 (2d Cir. 1991) ("The rule is well-settled in this circuit that a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony.").

Plaintiff's "discriminatory atmosphere" argument is further weakened by Plaintiff's own deposition testimony that she "didn't feel [the adverse treatment] was because of [her] gender." [Dkt. 23-6 at 164:22-23, *see also* 163:7-13]. When asked how she was treated differently than other similarly situated male individuals, as alleged in her complaint, Plaintiff explained that other *women* in her office in the same position received preferential treatment. *Id.* at 163:15-164:17. When asked whether there were any male employees she believed were treated differently, she said no. *Id.* Not even Plaintiff herself infers from the circumstances that Defendant's actions were motivated by Plaintiff's sex. Accordingly, Plaintiff

fails to adduce facts establishing a prima facie case of discrimination, and Defendant is entitled to summary judgment on Count Two.[5]

### C. Count Three – Quid Pro Quo Sexual Harassment

In Count Three of her Complaint, Plaintiff alleges that she was subjected to unwelcome sexual advances because of her gender and that her rejection of those advances was a motivating factor behind Defendant's decision to terminate her temporary placement and not to hire her as a full-time employee. [Dkt. 1-1 at ¶¶ 37-40]. Specifically, Plaintiff claims that Martin commented on the fact that she was single, told her that he thought she was attractive, and asked her to go to dinner with him. Plaintiff declined Martin's invitation, indicating that she was not interested and that she did not mix business with pleasure. Plaintiff contends that this rejection led Martin to terminate her employment.

"The gravamen of a *quid pro quo* claim is that a tangible job benefit or privilege is conditioned on an employee's submission to sexual blackmail and that adverse consequences follow from the employee's refusal." *Carrero v. New York City Hous. Auth.*, 890 F.2d 569, 579 (2d Cir. 1989). Thus, "to establish a *prima facie* case of *quid pro quo* harassment, a plaintiff must present evidence that she was subject to unwelcome sexual conduct, and that her reaction to that conduct was then used as the basis for decisions affecting the compensation, terms, conditions

---

[5] For the same reasons the Court finds that Plaintiff fails to state a prima facie case for gender discrimination, the Court concludes that, even if Plaintiff succeeded at that stage, she would be unable to satisfy her ultimate burden of showing that Defendant's proffered legitimate non-discriminatory reason for terminating Plaintiff was not the true reason and that Defendant intentionally discriminated against her. *See supra* at n.5; *Littlejohn*, 795 F.3d at 307, 308 n.6; *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11 (1993).

or privileges of her employment." *Karibian v. Columbia Univ.*, 14 F.3d 773, 777 (2d Cir. 1994). She must show a "direct nexus" between the demand for sexual favors and an employment benefit or detriment. *Rennie v. Glass, Molders, Pottery, Plastics & Allied Workers Int'l Union*, 38 F. Supp. 2d 209, 215 (D. Conn. 1999) (citing *Burlington v. Ellerth*, 524 U.S. 742 (1998)). If a supervisor uses his actual or apparent authority to further the harassment, an employer will be liable for the *quid pro quo* harassment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 803 (1998).

Defendant argues that Plaintiff fails to demonstrate the she was subject to unwelcome sexual conduct because she cannot show that Martin's facially asexual behavior was sexual in nature. [Dkt. 23-2 at 22-25]. Defendant next argues that Plaintiff has not shown that there was a direct nexus between the alleged unwelcome sexual conduct and an adverse employment action because MXD made the decision to terminate Plaintiff before the incident occurred. *Id.* at 26-29.

### 1. Unwelcome Sexual Conduct

Whether Martin's conduct constitutes the requisite unwelcome sexual conduct is a close call. Prohibited discrimination includes "the entire spectrum of disparate treatment of men and women in employment[.]" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks omitted). "The kinds of workplace conduct that may be actionable . . . include unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature." *Redd v. New York Div. of Parole*, 678 F. 3d 166, 175 (2d Cir. 2012) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 68 (1986)) (internal quotation marks and brackets omitted). The Supreme Court has cautioned that Title VII, and so the

CFEPA, should not be "expand[ed] into a general civility code[.]" *Onacle v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). "The prohibition of harassment on the basis of sex requires neither asexuality nor androgyny in the workplace; it forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's employment[,]" for instance, by withholding or granting some employment benefit or detriment depending on whether an employee gives in to his/her supervisor's unwelcome sexual advances. *Id.*

"Whether particular conduct was unwelcome presents difficult problems of proof." *Gallagher v. Delaney*, 139 F.3d 338, 346 (2d Cir. 1998), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998). In *Gallagher v. Delaney*, the Second Circuit considered whether the evidence was sufficient for a trier of fact to conclude that the conduct constituted unwelcome sexual advances. *Id.* The *Gallagher* Court explained that "indirect pressure" to engage in sexual activity is not necessarily negated by the lack of any explicit request to do so, depending on "cumulative perceptions and backgrounds." *Id.* As such, the court concluded that the evidence—the supervisor having told the plaintiff he dreamed she kissed him, invited her to sit on his lap, asked her to lunch on numerous occasions, given her numerous romantic gifts and cards, offered company perks, complimented her physical appearance, and invited her to Atlantic City—could support the plaintiff's contention that the defendant "did things of an erotic nature to which she objected[,]" noting that the plaintiff's acceptance of various gifts from the supervisor on occasion did not necessarily demonstrate her amenability to an intimate relationship. *Id.* at 343-44, 346.

Similarly, and relying on the guidance in *Gallagher*, in *Gregg v. New York State Department of Taxation & Finance*, the court concluded that the evidence, though lacking any sexually suggestive comments or gifts, was sufficient to withstand summary judgment. No. 97-CV-1408, 1999 WL 225534, at *11 (S.D.N.Y. 1999). In *Gregg*, the plaintiff alleged "repeated invitations to meals and the like, compliments on his physical appearance and recurring 'personal' questions[,]" as well as allegations of offensive touching and communication through "appearance and looks." *Id.* The court concluded that this provided a sufficient basis for a jury to conclude that the conduct was of a sexual nature and, based on the plaintiff's repeated rebuffs of the invitations, that such conduct was unwelcome. *Id.*

In *Morris v. New York City Health and Hospital Corporation*, the court reasoned that, "[w]hile Plaintiff may have felt or believed that because Larsen is a gay man, his invitations to Plaintiff were sexual in nature, without some evidence to support his feelings or his belief, Plaintiff cannot establish that Larsen was asking him out to dinner because of his gender or sex." 09-CV-5692 (MKB)(ST), 2018 WL 4762247, at * (E.D.N.Y. Sept. 30, 2018). Thus, despite Larsen inviting the plaintiff to have drinks on numerous occasions, including offering to get the plaintiff a job closer to his home if he agreed to have drinks, the court concluded that the plaintiff failed to establish a prima facie case of sexual harassment. *Id.*

In *Manko v. Deutsche Bank*, the court considered evidence establishing that two male co-workers, on one occasion each, invited the plaintiff to socialize outside of the office. 554 F. Supp. 2d 467, 480 (S.D.N.Y. 2008). Plaintiff also introduced background evidence of the reputation of one of the men for "chasing

women," which the court found could lead one to construe his advance as a request to begin a romantic relationship. *Id.* There was no such background evidence concerning the other man, and the court concluded that "[m]erely inviting a female colleague to socialize after work patently fails to rise to the level of a sexual overture." *Id.* The court recognized that requests for sexual activity are not always explicit, but concluded that where there is no evidence that the man "persisted in making unwelcome advances, his statements or conduct were erotic or sexually suggestive, or that he had [an] alleged reputation for 'chasing women,' [the plaintiff] has not met her burden of establishing the sexual nature of [the] conduct." *Id.*

The conduct and circumstances here are somewhere between those in *Gallagher* and *Gregg* and those in *Morris* and *Manko*. As in all four cases, Martin invited Plaintiff to socialize outside of work. Plaintiff explained at her deposition that, based on Martin's invitation and other comments, she believed he was romantically and sexually interested in her. [Dkt. 26-4 (Brauer Dep. Tr.) at 94:2-22]. However, unlike in *Morris* and *Manko*, and more similar to the other two cases, Martin commented on the fact that Plaintiff was single and indicated that he thought she was attractive. Martin also called Plaintiff "sunshine" and "ray of sunshine" on a regular basis. *Id.* at 81:6-82:9. Martin's comments and pet names for Plaintiff add support to Plaintiff's claimed perception that Martin's interest in socializing with her outside of work was sexual in nature. However, at her deposition, Plaintiff explained that she took this to convey Martin's happiness to see her and his belief that she "brought joy to the office" because of her pleasant demeanor. *Id.* Plaintiff

stated that she thought this was "[a] little weird, but not sexual[.]" *Id.* Notably, Plaintiff told Martin that if he needed to talk about his marital problems, she was there for him. Plaintiff therefore initiated an interpersonal relationship with Martin. available. From that offer a jury might reasonably find the dinner invitation was not unwanted. Based on this evidence, the Court concludes that, while a weak set of facts, a jury may be able to find that Martin's conduct constitutes unwelcome sexual advances.

### 2. Causation

Defendant next argues that Plaintiff fails to establish that her rejection of Martin was the basis of any employment decision. [Dkt. 23-2 at 27]. To satisfy the causation requirement, Plaintiff must show that "her reaction [to the unwelcome sexual conduct] was then used as the basis for decisions affecting the . . . terms . . . of her employment." *Karibian*, 14 F.3d at 777. "It is enough to show that the supervisor used the employee's acceptance or rejection of his advances as the basis for a decision affecting the compensation, terms, conditions or privileges of the employee's job." *Id.* at 778. "[I]n the typical *quid pro quo* case, the employee who refuses to submit to her supervisor's advances can expect to suffer some job-related reprisal." *Id.* (citing *Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 142 (2d Cir. 1993)). "[I]n such 'refusal' cases, evidence of some job-related penalty will often be available to prove *quid pro quo* harassment." *Id.* However, a decision affecting a plaintiff's employment cannot be based on a rejection that occurs after that decision is already made. *See e.g.*, *Gregory*, 243 F.3d at 701.

Here, it is undisputed that Plaintiff declined Martin's invitation to dinner. It is also undisputed that MXD decided not to hire Plaintiff permanently and terminated her temporary placement with the company effective March 12, 2016. The evidence shows, however, that MXD made the decision to terminate Plaintiff's placement on or before February 19, 2016.  As discussed *supra* at Sections III.A. and B., Plaintiff's Complaint and sworn interrogatory response state that the encounter between her and Martin occurred on February 27, 2016. At her deposition, which took place one month after she signed her name to the interrogatory responses verifying that she reviewed them and believed they were accurate, Plaintiff said she did not remember exactly when it occurred. However, Plaintiff does not provide any evidence tending to show that the interaction took place prior to February 27, 2016, or, more importantly, prior to MXD having made its decision to terminate Plaintiff on February 19, 2016.

Because Plaintiff made a sworn statement that the rejection took place on February 27, 2016, and because she has provided no evidence to support a conclusion that it occurred earlier than that, there is no basis for a jury to find that the interaction caused the February 19th decision to terminate Plaintiff. A decision cannot be motivated by an event which has not yet occurred. The Court therefore grants summary judgment in favor of Defendant on Count Three.

D.  Count Four – Aiding & Abetting Discriminatory Employment Practice

The CFEPA's aiding and abetting provision provides that "[i]t shall be a discriminatory practice in violation of this section . . . [f]or any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of

any act declared to be a discriminatory employment practice or attempt to do so." Conn. Gen. Stat. § 46a-60(b)(5). "CFEPA aiding and abetting liability thus requires that the individual assists another person in discriminatory conduct and a sole perpetrator cannot be held liable." *Bolick v. Alea Grp. Holdings, Ltd.*, 278 F. Supp. 2d 278, 282 (D. Conn. 2003).

Defendant argues that it is entitled to summary judgment on this count because the statute and case law make clear that while an individual may violate this statute, an employer cannot be held liable under the CFEPA for aiding and abetting its own discriminatory conduct. [Dkt. 23-2 at 30-31].

In Count Four of her Complaint, Plaintiff alleges that Defendant, by and through its agents and/or employees, aided, abetted, incited, and/or compelled Randstad, the staffing agency, to end Plaintiff's job assignment with Defendant and that this action was motivated by gender discrimination and/or Plaintiff's rejection of Martin's sexual advances. [Dkt. 1-1 at ¶¶ 41-43]. In her Opposition to the Motion for Summary Judgment, Plaintiff argues that MXD aided and abetted *Martin's* discrimination against Plaintiff by allowing him to contact Randstad and make false claims about Plaintiff's performance after he had harassed her. [Dkt. 26-1 at 19].

Plaintiff did not bring any discrimination claims against Randstad or against Martin in this action and liability therefore cannot be imposed against them. *See Cintron v. Atticus Bakery LLC*, 242 F. Supp. 3d 94, 107 (D. Conn. 2017). Plaintiff only pursued claims for discrimination against MXD. Her allegations of discrimination arise out of MXD's termination of her, through Martin as her supervisor, allegedly on the basis of her sex. Thus, the only available discriminatory conduct Plaintiff

can claim MXD aided and abetted was its own. *See Farrar v. Town of Stratford*, 537 F. Supp. 2d 332, 356 (D. Conn. 2008). Under Connecticut law, it is clear that "while an individual employee may be held liable for aiding and abetting his employer's discrimination, an employer cannot be liable for aiding and abetting its own discriminatory conduct." *Id.*; *see also Canty v. Rudy's Limousine*, No. Civ. 3:04CV1678(CFD), 2005 WL 2297410, at *2 (D. Conn. Sept. 15, 2005). As a result, Plaintiff's proper avenue for relief was through her claims against MXD under §§ 46(a)-60(b)(1), (b)(4), and (b)(8) based on a respondeat superior theory of liability. *See Cintron*, 242 F. Supp. 3d at 107; *Farrar*, 537 F. Supp. 2d at 357; *Bolick*, 278 F. Supp. 2d at 282-83; *Canty*, 2005 WL 2297410, at *2; *Waslik v. Stevens Lincoln-Mercury, Inc.*, No. CIV 3:98CV1083 (DJS), 2000 WL 306048, at *7 (D. Conn. Mar. 20, 2000). Accordingly, the Court grants summary judgment in favor of MXD on Count Four.

## V. <u>Conclusion</u>

For the foregoing reasons, the Court GRANTS Defendant's Motion for Summary Judgment and enters judgment in favor of Defendant on Count One, alleging retaliation, Count Two, alleging gender discrimination, Count Three, alleging *quid pro quo* sexual harassment, and Count Four, alleging aiding and abetting of a discriminatory practice. The Clerk is directed to close the case.


IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: September 4, 2019.